UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KATHI ORSO [sic], individually and )
on behalf of all others similarly situated, )
                                                        )
                     Plaintiff, )
                                                         )    Case No. 04 C 0114
     v. )
                                                           )    Judge Joan B. Gottschall
BAYER CORPORATION, )
                                                      )
                     Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Kathi Urso[1] ("Urso") has filed a four-count amended complaint against defendant Bayer Corporation ("Bayer") for herself individually and on behalf of a putative nationwide class of fellow plaintiffs. This court's jurisdiction is based on diversity.[2] Before the court are Bayer's motion to dismiss the amended complaint, motion to strike exhibits and portions of pleadings, and motion for sanctions. For the reasons set forth herein, the motion to dismiss is granted in part and denied in part, the motion to strike is denied as moot, and the motion for sanctions is denied.

**I.    BACKGROUND**

Urso alleges that she suffered injuries from using Neo-Synephrine, an over-the-counter

---

[1] The complaint was originally filed naming "Kathi Orso" as the class representative. Subsequent pleadings, however, refer to her as "Urso." The court assumes the latter designation is correct for the purposes of this order.

[2] The Amended Complaint alleges that Urso is a citizen of Illinois, that Bayer is an Indiana corporation with its principal place of business in Pennsylvania, and that the amount in controversy exceeds $75,000.

1

nasal decongestant manufactured by Bayer. Bayer has manufactured and distributed Neo-Synephrine for decades, first as a prescription medication, and more recently as an over-the-counter medication. Neo-Synephrine's packaging warns potential users not to exceed the recommended dosage, not to use for more than three days, and to "stop use and ask a doctor if symptoms persist for more than 3 days." Customers are cautioned that if they use Neo-Synephrine for longer than the recommended time period, nasal congestion may recur or worsen. Urso claims that she used Neo-Synephrine exactly as directed and became permanently addicted to it. She currently suffers from rhinitis medicamentosa, allegedly brought on by using Neo-Synephrine, and cannot breathe without the use of a topical nasal decongestant. Her complaint seeks monetary and injunctive relief against Bayer for herself and on behalf of all of the individuals in the putative class.

When Bayer manufactured and distributed Neo-Synephrine as a prescription medication in the past, it provided physicians with information about Neo-Synephrine's potentially dangerous side effects as required by law. Once Bayer obtained approval to sell Neo-Synephrine as an over-the-counter medication, the Food and Drug Administration ("FDA") no longer required it to inform physicians directly of any new risks or contraindications associated with Neo-Synephrine. Instead, Bayer was required to put certain instructions and warnings on the label of the product and was also required to file certain information, including results of its studies relating to Neo-Synephrine, with the FDA on a periodic basis. Currently, there is no legal requirement that drug manufacturers, including Bayer, provide the detailed information supplied to the FDA to physicians or the public directly.

In her original complaint, Urso pleaded claims in strict liability, negligence, consumer fraud, and deceptive trade practices. Although Bayer moved to dismiss all of the causes of

2

action, Urso's complaint survived Bayer's motion nearly intact. This court concluded that only the failure to warn component of her products liability counts did not state a claim upon which relief could be granted, given the Seventh Circuit's recent holding in *Kelso v. Bayer Corp.*, 398 F.3d 640, 642 (7th Cir. 2005) (holding Bayer's warnings on Neo-Synephrine's packaging are adequate as a matter of law). The remainder of her products liability claim, as well as the other three counts, were allowed to stand. Minute Order (March 8, 2005). Urso nevertheless moved for leave to amend her complaint and filed her amended complaint on July 27, 2005.

Urso's amended complaint is substantially similar to her original complaint. In both, she set out four counts alleging strict products liability, negligence, consumer fraud, and deceptive trade practices. The two principal differences are Neo-Synephrine's alleged design defect and the failure to warn claim, both of which had other incarnations in the original complaint. With respect to the design defect, Urso has alleged that Neo-Synephrine contains a dangerous neurotransmitter in its formula (as opposed to the allegedly dangerous combination of two ingredients pleaded in the original complaint). Since the court dismissed her original failure to warn claim in its previous ruling, Urso's amended complaint advances a novel legal theory: that Bayer's instruction to "ask a doctor" if symptoms persist beyond three days on Neo-Synephrine's label gives rise to a duty to warn physicians directly, presumably so the physicians can pass these warnings along to their patients when consulted in accordance with the labeling. Urso claims that physicians, including her own, are currently unable to obtain information about Neo-Synephrine's risks and side effects in the absence of such disclosure and distribution, and argues that the burdens of distributing this information are not great and are outweighed by both the helpfulness of and the need for the information.

Not surprisingly, Bayer has denied the existence of this duty. Instead, it states that its

3

warnings on Neo-Synephrine are adequate as a matter of law. It further asserts that Neo-Synephrine's warning to "ask a doctor" is not a voluntary undertaking giving rise to an additional duty to warn since it was mandated by the FDA and was given pursuant to law and not gratuitously. Indeed, Bayer argues that its only duty to warn is to the ultimate user – the consumer – and that the learned intermediary doctrine, which imposes a duty on drug manufacturers to educate physicians on the risks of prescription drugs, does not apply to over-the-counter medication. Bayer also addresses the remainder of Urso's complaint, arguing that the allegations are insufficient to state a claim in strict products liability or negligence (Counts I and II), and that Counts II, III and IV (negligence, consumer fraud, and deceptive practices) are preempted by the Food and Drug Modernization Act of 1997, Pub. L. No. 105-115, 111 Stat. 2296, and by the preemption provisions contained in each of the state statutes.

## II. DISCUSSION

### A. Motion to Dismiss

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court reviews all facts alleged in the complaint and any reasonable inferences drawn from those facts in the light most favorable to the plaintiff. *Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000). The court will grant the motion only if it appears that the plaintiff cannot prove any set of facts that would entitle her to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

#### 1. Strict Products Liability and Negligence (Counts I and II)

The first two counts of Urso's complaint are common law tort claims alleging strict liability and negligence arising from Bayer's manufacture, distribution, marketing and labeling of Neo-Synephrine. Urso did not designate a specific products liability theory of recovery in her

4

complaint. Products liability actions traditionally encompass three types of actionable claims: design defect, manufacturing defect, and failure to warn. *Sollami v. Eaton*, 772 N.E. 2d 215 (Ill. 2002). As this court previously held when addressing Bayer's first motion to dismiss, Urso's failure to warn claim, both in strict liability and in negligence, is barred as a matter of law by the Seventh Circuit's holding in *Kelso v. Bayer Corp.*, 398 F.3d 640 (7th Cir. 2005). In *Kelso*, the plaintiff misused Neo-Synephrine due to a perceived ambiguity in the product's labeling and claimed that Bayer should be strictly liable for his damages under a failure to warn theory. *Id*. at 641. The Seventh Circuit rejected his argument and affirmed summary judgment for Bayer, holding that Neo-Synephrine's warnings on its packaging were adequate as a matter of law. *Id*. at 643. Since the Seventh Circuit has spoken definitively on the adequacy of Neo-Synephrine's labeling, this court was, and still is, bound by its holding here.

In her amended complaint, Urso attempts to circumvent *Kelso*. Because Bayer advises consumers to see a doctor if symptoms persist, Urso argues that it has a duty to warn *physicians* in addition to its duty to warn consumers and end users.[3] According to Urso, along with posting a warning on boxes of Neo-Synephrine, Bayer should be required to notify physicians of the dangers of its over-the-counter products or, in the alternative, disclose that it is not advising physicians about Neo-Synephrine's dangers on its labeling. In support of this duty, she points out that Neo-Synephrine was once available only by prescription, during which time Bayer was required by law to notify physicians about its side effects, and that imposing such a duty to warn

---

[3]Urso has also suggested that the warnings on Neo-Synephrine are inadequate because they fail to fully describe the nature and extent of its side effects and symptoms of overuse. However, as mentioned earlier, the Seventh Circuit has held that the labeling is adequate as a matter of law, and the court finds that this argument is foreclosed by *Kelso*.

upon Bayer would be fair.  Bayer is already required to submit adverse drug experience information about Neo-Synephrine to the FDA and could send that same information to physicians.  Urso argues that because Bayer has communicated directly with physicians in the past, when Neo-Synephrine was a prescription drug, doing so now would not impose an onerous burden.  In addition, Urso casts Bayer's labeling (which states that Neo-Synephrine users should "ask a doctor" if symptoms persist longer than three days) as giving rise to a common-law duty to warn all healthcare professionals of information related to the adverse effects of overuse of Neo-Synephrine.

Whether a duty exists is a question of law, which must be determined by considering the foreseeability of the injury, the likelihood of the injury, the burden of preventing the injury, and the consequences of that burden on the defendant.  *Gouge v. Central Illinois Public Service Co.*, 582 N.E.2d 108, 112 (Ill. 1991); *Kirk v. Michael Reese Hosp. and Medical Center*, 513 N.E.2d 387, 396 (Ill. 1987).  Here, Urso has provided no authority supporting her argument that an underlying duty to disseminate information to physicians exists, and the court has found no legal basis for the claim.  It is unclear how either the foreseeability or likelihood of injury is affected by requiring drug companies to send doctors scientific information on their drugs (which presumably would amount to a considerable amount of information concerning many drugs) as opposed to having the doctor call the drug company for relevant information if and when a patient makes an inquiry.  Indeed, the duty that plaintiff advocates seems likely to inundate physicians with information they do not need and cannot use, rather than to minimize the likelihood of injury.  Given these considerations, as well as the burden on companies like Bayer in complying with such a duty, this court cannot accept Urso's argument that Bayer had a duty to warn physicians.  Without this duty, Urso cannot state a claim for failure to warn physicians

under either a strict liability or negligence theory. Accordingly, the portions of Count I and II based on failure to warn are dismissed.

Dismissing the failure to warn portions of Counts I and II does not mean that these counts must be dismissed in their entirety. Urso may still be able to prove, consistent with the allegations in her complaint, a design or manufacturing defect. Indeed, under the liberal notice pleading standard that applies in federal court, Counts I and II of her complaint sufficiently allege claims for design defects. *See Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005) ("Complaints initiate the litigation but need not cover everything necessary for the plaintiff to win; factual details and legal arguments come later."). According to the complaint, Neo-Synephrine contains a neurotransmitter that affects the body's reaction to other neurotransmitters after limited exposure, and exposure to Neo-Synephrine and to the neurotransmitters caused Urso's injuries. These assertions provide Bayer with notice of the nature of the claims and can thus form the basis of the design defect claim. Thus, the motion to dismiss Counts I and II to the extent that they allege claims for design defects is denied.

2. *Preemption of Negligence Claim (Count II)*

Bayer argues that Count II for negligence is preempted by the Food and Drug Administration Modernization Act of 1997 ("the FDA Act"), 21 U.S.C. §301, *et seq*. The doctrine of preemption is implicated where there exists a comprehensive, exclusive remedy under federal law that restricts a plaintiff's right to recover under state or common law. *Cipollone v. Liggett Group, Inc*., 505 U.S. 504, 516 (1992). Preemption may arise either expressly--where the federal legislation states that any other claims are preempted--or by implication. *Id*. at 517. Implied preemption arises in one of two ways: (1) through a broad and comprehensive Congressional scheme occupying the entire field, *Fidelity Fed. Sav. & Loan*

7

*Assn. v. De la Cuesta*, 458 U.S. 141, 153 (1982), or (2) by a conflict between a state remedy and a Congressional enactment, *Geier v. American Honda Motor Co.*, 529 U.S. 861, 884 (2000); *see also Caraker v. Sandoz*, 172 F. Supp. 2d 1018, 1031 (S.D. Ill. 2001).

There is a strong presumption against implied preemption, particularly in areas that states have "traditionally occupied." *Maryland v. Louisiana*, 451 U.S. 725, 726 (1981); *Geier*, 529 U.S. at 907. Health and safety is such an area, and in *Sandoz*, the court held that FDA drug labeling laws did not preempt the plaintiff's state common law tort claims on a failure to warn theory. *Sandoz*, 172 F. Supp. 2d at 1044. Instead of viewing compliance with FDA standards as an absolute bar to recovery in a civil action, the court stated that FDA labeling requirements should be viewed as minimum thresholds. *Id.* at 1033. Other courts have reached similar conclusions, allowing plaintiffs to recover in tort against drug manufacturers, even when those manufacturers have complied with all relevant FDA regulations. *Peters v. Astrazeneca, LP*, 417 F. Supp. 2d 1051, 1057 (W.D. Wis. 2006); *Gonzales v. Surgidev Corp.*, 899 P.2d 576 (N.M. 1995).

At this juncture, the court finds that Urso's negligence claim is not preempted by the FDA Act. While the FDA Act restricts states from regulating drugs falling within its ambit, it does not bar recovery for actions in tort. Indeed, the FDA Act explicitly states that product liability claims do not fall within its parameters. 21 U.S.C. § 379r(e) ("Nothing in this section shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State."). Although *Sandoz* involved a strict liability claim and Count II of Urso's complaint alleges negligence, this court finds the reasoning behind *Sandoz* persuasive. Both this case and *Sandoz* involved pharmaceuticals that allegedly affected the

8

health and welfare of citizens of Illinois. The same factors militating against preemption in strict liability are present here, and for the purposes of a motion to dismiss, the two types of claims are similar enough to enable Urso to move forward with her claim. *Navarro v. Fuji Heavy Industries, Ltd.,* 117 F.3d 1027, 1029 (7th Cir. 1997) (no practical difference between negligence and strict liability in defective design action). To the extent Count II states a claim for negligence other than Bayer's alleged failure to warn, Bayer's motion to dismiss Count II for preemption is denied.

        3.     *Consumer Fraud Act (Count III) and Deceptive Trade Practices Act (Count IV)*

Finally, Bayer argues that Counts III and IV, which purport to state claims under the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*, and the Illinois Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*, are also preempted by the FDA Act.[4] In its previous order on Bayer's motion to dismiss the original complaint, the court held that these claims should not be dismissed because Urso might be able to state claims that were not preempted. Order (March 8, 2005) ("The court does not rule on the preemption question here, however, because even if preemption applies, it is possible that Orso could present evidence on which she could base successful claims, such as, for example, that Bayer did not actually comply with the FDA's regulation in its labeling or other manufacturing or marketing activities."). Bayer did not request reconsideration of this ruling, and the court finds that addressing whether these claims are

---

[4] Bayer also argues that both the Consumer Fraud Act and the Deceptive Trade Practices Act contain provisions that preempt these claims. However, Bayer did not raise this argument in the first motion to dismiss, and the court finds that it has waived this argument for the purposes of a motion to dismiss. If Bayer wishes to pursue this defense, it may do so at summary judgment.

preempted is still premature. The motion to dismiss Counts III and IV is denied.

B.	Motion for Sanctions[5]

Bayer has moved for sanctions based on Exhibit B to Urso's response to the motion to dismiss — a letter from Bayer to Philip Torf about Neo-Synephrine and rebound congestion. Bayer asks that this exhibit be stricken and that Urso's attorneys be barred from representing Urso or any class which alleges a claim against Bayer based on Neo-Synephrine.

After filing the initial complaint, Robert Holstein, one of Urso's attorneys, met with Mr. Torf, who is both an attorney and a licensed pharmacist. Torf Affidavit at ¶13. At the meeting, the attorneys discussed the properties of Neo-Synephrine and afterwards, Mr. Torf decided to investigate further. He consulted the Physicians' Desk Reference and then bought a package of Neo-Synephrine and called Bayer at the 800 number printed on the side label to obtain additional information. *Id.* at ¶¶14-15. Mr. Torf made five separate inquiries to Bayer. During his initial call on June 17, 2005, he spoke with Jadine Stephan, identifying himself as a pharmacist acting on behalf of a customer and asking for information on Neo-Synephrine Extra Strength. Stephan Declaration at ¶¶ 6-7. Mr. Torf called twice on June 20, 2005, once on June 28, 2005, and for the last time on June 30, 2005, each time asking about Neo-Synephrine yet never disclosing that he was an attorney or that he had consulted with attorneys for a plaintiff in a case against Bayer. *Id.* at ¶ 8. Ms. Stephan and Eileen Barry, another Bayer employee, responded to Mr. Torf's inquiries, both over the phone and by leaving messages for him. Barry Declaration at ¶¶ 3-4. In

---

[5]Urso attached a number of exhibits to her response to the motion to dismiss. Bayer has moved to strike most of these exhibits, arguing that they are irrelevant and not properly considered on a motion to dismiss. Because the court has not considered these exhibits in deciding the motion to dismiss, the motion to strike is denied as moot.

his last communication, Mr. Torf asked Ms. Stephan to respond to five specific questions about Neo-Synephrine in writing.[6] Ms. Stephan faxed her responses to Mr. Torf at his office, and Urso included the responses as Exhibit B to her response to Bayer's motion to dismiss. Stephan Declaration at ¶¶ 8-9. Mr. Torf filed a notice of appearance in this case on August 2, 2005 and is designated as one of Urso's attorneys on the amended complaint, filed July 27, 2005.

Bayer argues that Mr. Torf violated the rules of professional conduct when he contacted Bayer employees directly and not through Bayer's counsel and when he represented himself as a pharmacist acting on behalf of a customer and did not identify himself as an attorney. Additionally, it claims that Mr. Holstein's conduct amounted to "inducing another" to violate Local Rule 83.54.2, which is in and of itself a violation of the Local Rules. In response, Urso argues that Mr. Torf's communication was not improper because he was not her attorney at the time of the communication. She also asserts that Mr. Holstein never asked Mr. Torf to contact Bayer and cannot be deemed to have "induced" Mr. Torf's conduct. She also argues that Mr. Torf did not even know about the nature of the litigation or the parties involved prior to the communications. Her response to Bayer's motion casts Mr. Torf as a type of consultant, not an attorney, who was not subject to the Rules of Professional Conduct at the time of his conduct.

Local Rule 83.54.2 provides that:

During the course of representing a client a lawyer shall not communicate or

---

[6] The questions were:
1) How does Neo-Synephrine work, pre- or post-synaptically?
2) What causes rebound congestion?
3) How is rebound congestion treated?
4) Are there any printed materials about rebound congestion for health professionals?
5) Was the 1% solution of Neo-Synephrine ever a prescription product?
Stephan Declaration at ¶ 8.

> cause another to communicate on the subject of the representation with a
> party the lawyer knows to be represented by another lawyer in that matter
> unless the first lawyer has obtained the prior consent of the lawyer
> representing such other party.

The court has the "inherent power to protect the orderly administration of justice" which "necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." *Blanchard v. Edgemark Financial Corp.*, No. 94 C 1890, 1998 WL 988958, at *9 (N.D. Ill. Sept. 11, 1998) (citing *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir. 1985)). In determining whether to impose sanctions or which sanctions to impose, the court should consider "the seriousness of the violations and whether the violations were intentional, as well as the nature and extent of prejudice suffered or likely to be suffered by the parties in the future as a result of the violation." *In re Air Crash Disaster Near Roselawn, IN on Oct. 31, 1994*, 909 F. Supp. 1116, 1124 (N.D. Ill. 1995).

The courts in *Blanchard* and *In re Air Crash Disaster* considered conduct under Rule 4.2 of the Illinois Rules of Professional Conduct, which is substantively similar to Local Rule 83.54.2. Although both courts imposed sanctions on the attorneys for violating the "no contact" rule, the attorneys' specific conduct and intent dictated the severity of the sanctions. In *In re Air Crash Disaster*, the plaintiffs' attorney had a consulting firm distribute a questionnaire to a group of pilots who were linked to the litigation. The plaintiffs' attorney admitted that in hindsight, commissioning the questionnaire opened the possibility of an ex parte communication with an agent of a represented party and thus risked a violation of Rule 4.2. *Id.* at 1120. He argued, however, that because he had acted in good faith and did not willfully set out to violate the Rule, the court should not impose sanctions. *Id.* The court rejected his argument, noting that "when confronted with a need to obtain information from

12

witnesses that might reasonably lead to ethical problems, [counsel] must take a conservative rather than aggressive approach." *Id.* at 1122. However, the only sanctions imposed were directly related to the questionnaire itself – returning all copies to the defendants' attorneys, barring plaintiffs' counsel from distributing additional questionnaires, and barring the questionnaires as evidence in the case. The court determined that because plaintiffs' attorney had acted in good faith, albeit with bad judgment, and because the defendants had not suffered undue prejudice from his actions, these sanctions, along with its opinion condemning his conduct, were sufficient punishment and would act as a deterrent for others contemplating similar action. *Id.* at 1124-25.

In *Blanchard*, however, the circumstances were different, and so were the sanctions. The underlying litigation involved a collection action by EdgeMark against Joseph Beale, who thereafter filed a counterclaim and became the named representative of a class action against EdgeMark. EdgeMark's attorney entered into settlement negotiations with Beale's attorney for the collection action without obtaining consent to negotiate from the class's counsel. *Id.* at *3. While there was evidence that class counsel knew of the negotiations and did not object, it was clear that he never gave his express approval either. *Id.* at *8. Although the parties' settlement was limited to Beale's claims and did not dispose of the class action, the court nevertheless concluded that EdgeMark's attorney violated Rule 4.2. Because Beale, as class representative, was represented by class counsel, EdgeMark's attorney had an obligation to obtain class counsel's consent prior to negotiating a settlement and presenting it to the court. *Id.* The court found that EdgeMark's attorney's conduct was sanctionable and disqualified him (but not his law firm) from further involvement in the litigation. It also

awarded attorneys' fees and costs to the class plaintiffs, and ordered that whatever facts would have been relevant and admissible had there been no settlement would be relevant and admissible in the continuing litigation. *Id.* at *12. The determining factor in *Blanchard* was the "serious and intentional" conduct on the part of the attorneys,[7] and the court also noted that the class had suffered prejudice as a result of EdgeMark's attorney's conduct. *Id.* at *10-*12.

     Mr. Torf's conduct in light of these two cases is extremely troubling, and the court might well be able to justify an award of sanctions. Although Mr. Torf may not have been Urso's legal counsel at the time of the communication, he was nevertheless an attorney who was performing a quasi-legal function and who should have been on notice of Local Rule 83.54.2. Regardless of whether he was working independently or at the behest of Urso's attorneys when he contacted Bayer, his communication was motivated by the litigation. In responding to the motion for sanctions, Urso makes clear that Mr. Torf knew he was being consulted about litigation because he (or at least Urso) says he was conducting Rule 11 diligence. The fact that he may not have known the finer points of the litigation is irrelevant since he clearly knew that he was being asked for information to assist with pending or planned litigation. He should have also known that Bayer was a party that would be represented by counsel. Additionally, Mr. Torf received enough information from Urso's attorneys that he knew the right questions to ask Bayer. Any attorney should have known that there was some type of dispute in which Neo-Synephrine, and therefore Bayer, was implicated.

---

[7]Although the court also condemned Beale's attorney's conduct, the motion for sanctions was directed toward EdgeMark's attorney only.

Mr. Holstein's conduct does not rise to the same level. The fact that Urso included Exhibit B, an ex parte communication from one of the defendant's employees, in its response to Bayer's motion to dismiss, demonstrates that Mr. Holstein was aware of Mr. Torf's communication and did not distance himself or his client from the communication but sought to benefit from it. On the other hand, it does not appear that he ever asked Mr. Torf to contact Bayer directly. Because there is no evidence that Mr. Holstein actively solicited Mr. Torf to contact Bayer, this court concludes that Mr. Holstein should not be sanctioned.

Both attorneys, but particularly Mr. Torf, treaded dangerously close to the "chalk line" demarcating sanctionable conduct from permissible conduct in *In re Air Crash Disaster.* They are both admonished to err on the side of caution in the future when seeking evidence through questionable channels. However, due to the absence of any prejudice, let alone significant prejudice, the court finds that striking the letter in response to Mr. Torf's conduct is sufficient to resolve this issue definitively and equitably.[8] The salient factor in this determination is simple—Bayer did not suffer any harm from Mr. Torf's conduct. Indeed, Bayer solicited inquiries by publishing its phone number on Neo-Synephrine's packaging. Any physician or member of the medical community could have contacted Bayer's help line and received exactly the same information Mr. Torf did had he or she known the right questions to ask. If Mr. Torf had not been motivated by Urso's claim, there would have been

---

[8]Bayer asked that Urso's counsel be disqualified as a sanction. However, this court has great discretion in determining the propriety and severity of sanctions in these cases and finds that the nature of the conduct at issue, when compared against Urso's right to be represented by the counsel of her choice, militates against disqualification. *See, e.g., Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir. 1983) (finding disqualification appropriate).

nothing improper about his inquiries. Striking the letter puts the parties into the same position they were in prior to the communication and is an adequate remedy given the nature of the conduct alleged. Urso is not barred from re-obtaining the information from the letter through proper discovery channels.

The motion for sanctions is denied. The letter attached as Exhibit B to the response to the motion to dismiss is stricken, and Urso is directed to return all originals and copies of the letter to Bayer.

### III. CONCLUSION

For the reasons set forth herein, Bayer's motion to dismiss is granted in part and denied in part, and Counts I and II are dismissed to the extent they seek to state a claim for failure to warn. Bayer's motion to strike is denied as moot. Bayer's motion for sanctions is denied except to the limited extent set forth herein. Exhibit B to Urso's response to the motion to dismiss is stricken.

ENTER:

/s/_____
Joan B. Gottschall
United States District Judge

Dated: September 27, 2006